## EXHIBIT A

| | |
|---|---|
| State of Illinois | ) |
| | ) ss |
| County of St. Clair | ) |

### UNSWORN DECLARATION UNDER PENALTY OF PERJURY
### IN SUPPORT OF COMPLAINT FOR FORFEITURE

I, Griffin Diecker, declare under penalty of perjury the following:

At all relevant times, I have been a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). The contents of this Declaration are based on information provided to me during the course of my investigation from participants in the criminal activity, from other witnesses, and from other law enforcement officers.

1. On July 24, 2024, DEA TFO Dustin Campbell (TFO Campbell) and declarant, as part of the DEA Fairview Heights Resident Office (FHRO) Highway Interdiction Initiative, observed a white 2022 Volvo semi-truck bearing Indiana apportioned registration 3139899 hauling a 2015 Utility trailer bearing Oregon registration HV60675, traveling on Interstate 70 westbound near mile marker 79.

2. DEA Intelligence analysts conducted computer inquiries of the semi-truck and trailer's registration through law enforcement databases and provided the following information to the TFOs: Both the semi-truck and 2015 Utility trailer returned registered to Penske Truck Leasing Company with an address of 2675 Morgantown Road, Reading, Pennsylvania 19607.

3. Additionally, the 2022 Volvo semi-truck displayed the company name J Chis LLC and the Department of Transportation (DOT) number 3808604. J Chis LLC is registered to the address 259 NE Gertz Road, Portland, Oregon 97211.

4. As officers were turning around in the center median from the Westbound lanes of traffic they observed the above tractor-trailer traveling in the far-right lane of traffic. As the tractor-

trailer passed officers location, TFOs observed two occupants in the cab of the semi-truck. Based on training and experience, officers knew this to be an uncommon practice for co-drivers to be awake at the same time and that trucking companies who employ co-drivers do so in an effort to travel from one location to another as quickly as possible. Having co-drivers allows one driver to receive the mandated rest by sleeping in the sleeper of the cab while the other continues to drive his/her allowable hours.

5. As the TFOs exited the median and into the left lane (fast lane) of Interstate 70 WB, they observed the trailer cross over the solid white fog line, onto the shoulder of the road, with the right most tires touching the rumble strip near mile marker 77. Additionally, the officers observed the semi-truck and trailer cross over the solid white fog line and dashed white fog line near mile marker 76.

6. After observing the above lane violations (625 ILCS 5/11- 709), declarant activated the emergency lights to conduct a traffic stop on the semi-truck and trailer. The semi-truck and trailer did not immediately pull over and declarant activated his siren. The semi- truck eventually came to rest at approximately mile marker 75 on I-70 Westbound.

7. Once the semi-truck and trailer came to a complete stop, TFO Campbell approached the passenger side of the semi-truck and trailer requested the driver pull the vehicle up further due to the driver stopping the semi-truck adjacent to a guard rail, causing a safety concern as the officers approached. After the semi-truck pulled forward, TFO Campbell was given permission to open the passenger door and made contact with the driver, identified as Guohai LIU, and the front seat passenger identified as Yong YANG.

8. As TFO Campbell was speaking with the occupants of the semi-truck, I exited the patrol vehicle and walked to the passenger side area for officer safety. As I walked to the passenger side of the truck, I observed a lock on the rear door of the trailer and a bolt seal on the side door of the trailer, however I did not observe a seal on the rear door. Based on training and experience, I know that

it is uncommon for logistics companies to utilize locks and not have a seal on the door to accompany the lock, if they are transporting freight. Additionally, I noticed the trailer being pulled by the semi-truck was a refrigeration trailer, however I noticed that the refrigeration unit was not running as I walked to the truck.

9. During the traffic-stop TFO Campbell advised G. LIU the reason for the traffic stop (crossing over the white fog lines) and advised G. LIU that he would not be receiving a ticket(s) for the violations. At this time, TFO Campbell requested G. LIU's driver's license and registration, which G. LIU provided. TFO Campbell asked if they were transporting cargo in the trailer and YANG advised "no," they were returning the trailer to Kansas. TFO Campbell asked where they picked up the empty trailer from, and YANG advised they were headed to Kansas to switch trailers.

10. TFO Campbell requested G. LIU to exit the vehicle and walk back to the patrol vehicle to receive a warning for the traffic violations. As G. LIU was exiting the vehicle YANG stated that G. LIU was a new driver, and it was his second trip.

11. While TFO Campbell continued speaking with YANG, YANG advised that they were team drivers. After confirming this statement with YANG, TFO Campbell asked YANG why he was awake. YANG responded stating, "we go uh actually our company in Portland", however YANG did not provide an answer for the question asked.

12. YANG continued stating, they dropped off food in Ohio and were heading to Kansas to drop off the trailer, and then would be traveling to a location TFO Campbell was unable to understand. YANG once again stated the trailer was empty. TFO Campbell asked why there was a seal and lock on the trailer if it was empty. YANG stated "we" put the lock on after being instructed to do so by their "boss".

13. After YANG again confirmed the trailer was empty, TFO Campbell advised YANG that

3

in his experience it is not normal for someone to put a lock on an empty trailer, which YANG confirmed by stating "No". Additionally, YANG stated that he had been with the company for approximately three months and has never been requested to lock an empty trailer before. As the conversation continued, TFO Campbell asked YANG if he would provide his logbook, and how big the company was. YANG responded stating the company had three trucks and four or five drivers.

14. At this time, YANG advised TFO Campbell there was a third subject inside the truck. YANG stated there were actually three drivers inside of the vehicle due to G. LIU being a new driver. YANG then provided his logbook to TFO Campbell showing he was in Pennsylvania earlier that morning doing a pre-trip inspection, and in Ohio during the early afternoon.

15. TFO Campbell asked YANG if the refrigerated trailer was running and YANG stated it was not. TFO Campbell asked YANG three times if there was anything illegal in the truck and on the third time asking, YANG advised everything was legal. TFO Campbell asked if there were any large amounts of marijuana and YANG stated no. TFO Campbell asked if there was any cocaine or heroin inside the truck, which YANG stated "no." At that time YANG volunteered consent to search the truck. TFO Campbell asked if there was any fentanyl inside the truck and YANG stated "no." TFO Campbell asked if there were any large amounts of United States currency over $10,000. YANG stated there was approximately $6,500-$7,000 inside of the truck, but he was unsure of the exact amount.

16. TFO Campbell asked for consent to search the truck, and the trailer, and YANG provided consent for both. TFO Campbell asked for consent to search for the following reasons: having both co-drivers awake while driving down the road, taking an extended period of time to pull over the semi-truck, inconsistencies in travel (not saying they traveled to Pennsylvania), having a seal and lock on an empty trailer, having three drivers, and YANG stating he has never locked an empty trailer before.

17. TFO Campbell requested Z. LIU (the third occupant of the vehicle) exit the semi-truck. YANG and Z. LIU both provided consent to search their personal property as well.

18. Simultaneously, while TFO Campbell was speaking with YANG, I requested G. LIU to sit in the front seat of the patrol vehicle while I completed a warning for the traffic violations. While completing the warning, I asked G. LIU where he was traveling to, which he advised "Kansas City". While continuing to speak with G. LIU, it appeared he did not understand the questions I was asking, due to a language barrier. I removed my department issued cellphone and requested G. LIU to show me which language he spoke, which he confirmed by pointing to Spanish. I asked G. LIU where they dropped their last load at (utilizing the translator app on my department issued phone). G. LIU stated they were going to Kansas City.

19. I continued with the translator service, via cellular phone, to translate the conversation. I asked G. LIU when the last time the trailer was loaded, which G. LIU replied, it was two or three days ago. Based on training and experience, I know that it is very uncommon to go two to three days without transporting cargo due to how expensive it is to operate a truck and semi-trailer. If the semi-truck and trailer are being operated the trucking company is accruing cost and not making any money if they are not transporting paying customers goods. This practice is indicative of a narcotics trafficking organization. The organization will operate with an empty trailer because the trucking company is only being used as the transportation method for illegal drugs and drug proceeds.

20. I asked where they dropped their last load, which G. LIU advised Portland, Oregon. G. LIU stated he has been with the company for a week. G. LIU further said the truck belonged to the boss of the company in Portland. G. LIU stated there was nothing inside of the trailer. After G. LIU confirmed the trailer was empty, I asked why there was a lock on the trailer and G. LIU stated, "I do not have a load right now and am going to look for one in Kansas City." G. LIU was asked what they

normally haul and he replied stating "household goods." G. LIU stated there was a co-driver or team driver inside of the truck. I asked G. LIU if there was anything illegal inside of the vehicle, and stated "no I don't have anything," along with shaking his head no multiple times. I asked if there were any drugs inside the vehicle and G. LIU stated "no" and shook his head no. I asked if there was any money over ten thousand dollars inside the vehicle and G. LIU stated "no" multiple times while shaking his head no.

21. I asked G. LIU for permission to search the truck, trailer, and all the contents for the following reasons: There being two driver's awake at once, having a lock and seal on the trailer while stating the trailer was empty, not having a load for two to three days, stating the last time the trailer was loaded was in Portland, Oregon, and the extended period of time it took for the truck to pull over.

22. G. LIU granted consent to search by stating "yes". TFO Campbell returned to the patrol vehicle and advised that the other two occupants of the vehicle (Z. LIU and YANG) also consented to a search of the vehicle, but they did not know where the key to the trailer was. I asked G. LIU where the key to the trailer was, which he replied stating in the front part where the co-driver sits. G. LIU stated he would retrieve the key.

23. I walked with G. LIU to the passenger area of the semi-truck and met with TFO Campbell and YANG. At this time, TFO Campbell advised that YANG had approximately $7,000 inside of the truck. YANG stated he was on the phone with his boss asking where the key for the trailer was. While YANG was talking on the phone, I observed the name of the caller was saved in his phone as "Mike." I advised YANG that there was no need to be on the phone with his boss when G. LIU knew where the key was. After I made the aforementioned statement, G. LIU stated he no longer knew where the key to the trailer was located.

24. At this time TFO Campbell walked to the rear of the trailer with the three occupants of the semi-truck while I began a search of the cab of the semi-truck. I began searching underneath the bed which is a common location to store contraband inside of a semi-truck. While I was searching underneath the bed of the semi- truck I located a large quantity, approximately twenty to thirty bolt style seals, used to secure the doors of trailers. Based on training and experience, I know that it is common for Drug Trafficking Organizations to utilize purchased seals in an attempt to make their trailers appear to have legitimate freight inside and to keep contraband locked in the trailer. I observed multiple bolt cutters underneath the bed which are needed to remove bolt seals from trailers.

25. After I did not locate any contraband under the bed, I began searching the storage compartments near the seats of the semi-truck in an attempt to locate the key for the lock of the trailer. I did not locate the key to the lock for the trailer and returned to where TFO Campbell, G. LIU, YANG, and Z. LIU were standing. After learning all three occupants did not know where the key for the seal (which YANG previously stated was still on the trailer from the last load) was located, I requested permission to cut the bolt seal from the door. YANG gave verbal consent stating "yeah." After receiving permission, I retrieved bolt cutters from the rear of the patrol vehicle and removed the seal from the door on the side of the trailer.

26. After removing the bolt seal, I entered the trailer and observed a single pallet of plastic wrapped boxes. I began unwrapping the plastic wrap from around the boxes and was able to open one of the cardboard boxes, which revealed nothing inside. Additionally, while opening the boxes, I noted the cardboard boxes were U-Line boxes which are commonly sold as moving boxes and are not commonly used to pack items as freight. I continued removing boxes from the pallet until locating a box I could feel was not empty. This box was located on the bottom right side of the pallet. I opened the box and observed several colored clothing bags and several boxes. I removed a red in color bag

and opened it finding a large quantity of rubber banded United States currency.

27. I exited the trailer and returned to TFO Campbell, G. LIU, Z. LIU, and YANG. I placed Z. LIU and G. LIU in handcuffs behind their back. TFO Campbell placed Yang in handcuffs behind his back. TFO Campbell double locked the handcuffs. YANG asked what happened and I advised him there was money located in the trailer. After placing G. LIU in handcuffs, he asked TFO Campbell what happened and TFO Campbell advised that we would explain everything shortly. G. LIU then made a spontaneous utterance "Money?"

28. TFO Brandon Smiley (TFO Smiley) and TFO Lucas Ward (TFO Ward) arrived on scene to assist with the investigation. TFO Ward and I returned to the inside of the trailer to photograph the United States currency. TFO Smiley, TFO Ward, and I noticed the United States Currency was rubber banded in smaller bundles and then placed into larger bundles and rubber banded again. Additionally, TFOs noticed multiple denominations throughout the United States Currency, with a majority of the United States currency being $20 bills. TFOs noted the manner in which the United States Currency was bundled, and the main denomination being $20 bills, is consistent with packaging/transportation of drug proceeds.

29. Additionally, during the investigation, TFO Steven Moravec, TFO Leo Kelly, TFO Hayden Rapien, TFO Brock Rich, TFO Cody Collins, and Resident Agent in Charge Robert Eisenbarger arrived on scene for assistance.

30. I exited the trailer and spoke with TFO Smiley advising that YANG had not been read his Rights per Miranda. TFO Smiley stated he advised YANG of his Rights per Miranda. I returned to the patrol vehicle and retrieved a Self-sealing evidence bag (SSEE Bag) to place the large amount of rubber-banded currency in. I and TFO Smiley began placing the United States currency inside of SSEE Bag #L000103683. I sealed SSEE bag #L000103683 in front of Z. LIU, G.LIU, and YANG as

witnessed by TFO Campbell.

31. Z. LIU, G.LIU, and YANG were asked if they wanted to claim ownership of the United States currency that was located inside the trailer and all three denied ownership of the currency and eventually refused to sign the SSEE.

32. TFO Smiley and TFO Kelly began a more thorough search of the cab of the truck. The TFO located more United States currency inside the cab of the truck. The currency was located in a black in color Nike backpack by TFO Smiley, as witnessed by TFO Kelly. The black in color Nike backpack was located in tractor portion in the rear passenger side upper cabinet. Inside of the Nike backpack was a clear Ziplock type bag containing a Loves professional driver's card, a motor vehicle report with Z. LIU's information, and United States currency wrapped with rubber bands.

33. The TFOs located more US Currency in the tractor portion in a gray in color suitcase sitting on top of a mini refrigerator. Inside the suitcase was a red and black bag containing United States currency wrapped with rubber bands and no markings.

34. TFO Smiley, as witnessed by TFO Kelly, placed the currency located in the over-head storage into SSEE #S001499045 which I sealed, as witnessed by TFO Kelly, TFO Smiley, and TFO Moravec. TFO Smiley, as witnessed by TFO Kelly, placed the currency located inside the grey suitcase into SSEE #S001499043, which I sealed, as witnessed by TFO Kelly, TFO Smiley, and TFO Moravec.

35. The clear Ziplock bag containing a Loves professional driver's card, a motor vehicle report with Z. LIU's information, and United States currency wrapped with rubber bands located inside the passenger side upper cabinet was placed into SSEE #M000580095 by TFO Smiley, as witnessed by TFO Kelly, and which I sealed as witnessed by TFO Kelly, TFO Smiley, and TFO Moravec.

36. ZANG was provided with an opportunity to sign SSEE bag #L000103677 to claim

ownership of the currency; however, ZANG refused ownership and refused to sign the SSEE bag.

37. Z. LIU, through the use of the interpreter service, was issued his Rights per Miranda from a DEA Miranda card. Z. LIU advised he wished to speak with an attorney. I asked Z. LIU if he would like to sign the SSEE Bag #L000103677 for ownership of the currency and he denied ownership.

38. G. LIU was also provided an opportunity to sign SSEE Bag #L000103677 to claim ownership of the currency. G. LIU said he would not like to sign the bag for ownership of the money. I then sealed SSEE Bag #L000103677, as witnessed by TFO Campbell, TFO Kelly, and G. LIU, and secured it inside of the patrol vehicle.

39. G. LIU, Z. LIU, and YANG were all transported to the Fayette County Sheriff's Department and placed in separate holding areas until interviews were conducted by TFO Kelly and TFO Moravec.

40. At the beginning of YANG's interview, TFO Kelly notified YANG of his Rights per Miranda via a DEA Miranda Warning Card, which YANG verbally stated he understood. TFO Kelly asked YANG if any of the United States currency, located during the traffic stop, belonged to him. YANG claimed ownership of United States currency that had been located in the cab of the semi-truck in the front passenger, overhead storage, and in a red Dallas BBQ Doordash bag that was inside of YANG's suitcase. YANG advised that this was approximately $7,000.00. YANG advised that of the money he claimed, approximately $4,000.00 was for fuel, approximately $2,000.00 was to fix the trailer after he damaged it, and approximately $1,000.00 was the balance from the previous trip.

41. YANG advised that he did not know who the money located inside of a Nike backpack belonged to. YANG further advised that he did not know who the United States currency in the semi-trailer belonged to.

42. As the interview continued, TFO Kelly asked if any of the cellular devices located in the

cab of the semi-truck belonged to YANG. YANG claimed three cellular phones (one iPhone 15 Pro Max, one iPhone 15, and one iPhone 11 Pro Max). TFO Kelly asked about one of the phones that neither G. LIU or Z. LIU had claimed. YANG advised that he did not know who that phone belonged to, but that it was already in the semi-truck when he got in. He believed that it may belong to someone other than the three current occupants.

43. YANG advised that he had been with the company since approximately May 2024. TFO Kelly asked YANG if he knew who the owner is of the trucking company (J Chis LLC) that he is driving for. YANG identified Steven CHEN as the owner of the company. YANG advised that an individual he knows as "Michael," later identified as Michael YANG, usually contacts YANG on behalf of the company to arrange for transport of cargo. YANG advised that he believed that Michael YANG may be a manager for the company.

44. TFO Moravec inquired how YANG came to work for this trucking company. YANG advised that a friend, "Ye" introduced him to the company. TFO Moravec asked how YANG is paid. YANG advised that sometimes he is paid in cash. YANG advised that the money is sometimes placed in a bag, like the red Doordash bag the seized currency was located in earlier. YANG advised that the money is not rubber banded when he receives it, and he rubber bands it himself. YANG advised that he is generally paid $.65/per mile by the company.

45. TFO Moravec asked how many drivers were working for the trucking company and YANG advised that there were approximately six drivers. YANG identified two of the other drivers that he has driven with as "Gong" and "Jerry." YANG advised that he has not made very many trips with these drivers and does not know them well. TFO Moravec inquired about the listed address for J Chis LLC (259 Gertz Road, Portland, OR). YANG advised that this was a truck lot that anyone can park in. TFO Moravec inquired how many times YANG has transported empty trailers and YANG

advised that he has done this twice, including the current trip. YANG advised the other trip was from Portland to New Jersey, and then from New Jersey to Oklahoma. TFOs noted that these would be extremely long distances to travel without cargo and would not be consistent with normal trucking operations. TFOs noted that long distance transports with no cargo are more common for individuals and trucking companies involved in bulk drug/drug proceeds transport. YANG later advised that it was actually Ohio, and not Oklahoma that he had driven to without cargo.

46. YANG advised that prior to this trip, he was picked up in the semi-truck by G. LIU and Z. LIU near the Home Depot in Jericho, NY. TFO Moravec inquired if that was close to his residence and YANG advised that it was near his residence. YANG advised that after being picked up, one of the other drivers drove to 125 Jackson Avenue, Edison, NJ, but the lot was already full, so they left and went to a rest area. After leaving the rest area, YANG began driving, from Pennsylvania to Ohio. That was when Michael YANG told him to drive to Kansas City, MO to switch trailers. YANG advised that Michael YANG told him that the refrigerated trailer was too small for the cargo they were to receive. YANG advised that he was unaware where they were supposed to go after Kansas City, MO.

48. After the interview with YANG was completed, TFO Diecker and TFO Campbell entered the interview room and placed the two sealed SSEE bags (#S001499045 and #S001499043) that contained the currency that YANG claimed into SSEE Bag #M000580224. YANG then signed SSEE Bag #M000580224 and I sealed the SSEE Bag as witnessed by TFO Campbell in front of YANG.

49. Upon arrival at the FHRO, three separate K9 sniffs were conducted on the currency seized from the cab of the truck and the trailer. Each K9 sniff consisted of four boxes, each placed on the floor of a conference room, with one box containing the seized currency. In each deployment, the

K9 alerted to the odor of narcotics on the box containing the seized currency.

50. During the road-side search of the semi-truck, officers located multiple documents with the name of Oversize Express. Additional investigation shows that on June 21, 2023, DEA TFOs conducted a traffic stop on a 2019 Freightliner semi-truck hauling a 2014 Great Dane trailer operating as Oversize Express. The traffic stop took place on Interstate 70 Westbound at mile marker 24 in Madison County, Illinois. The Penske rental semi-truck was being driven by two co-drivers who informed officers that they were driving without cargo from New Jersey to Kansas City, Missouri. During a probable cause search of the semi-truck, officers located rubber-banded United States currency concealed inside two trash bags inside two U-Haul brand cardboard boxes underneath the lower sleeper berth bed inside of the semi-truck. Officers also located another bag of rubber-banded United States currency above the driver seat. In total, $405,176.40 was seized. Michael Yang is listed as the owner of Oversize Express.

51. An official count of the seized United States currency was conducted. The amount totaled $306,900.

52. On July 24, 2024, TFO Marquez conducted an interview with G. LIU[1]. TFO Marquez restated the Miranda Warnings previously read to G. LIU and G. LIU verbally indicated that he understood his rights and agreed to speak with TFO Marquez.

53. G. LIU stated this was his second trip to Portland with YANG and Z.LIU. G. LIU stated they drove to Portland from New York a week prior. On the previous trip, once they arrived in Portland, G. LIU stated he was instructed to remain in the cab of the semi-truck while YANG and Z. LIU offloaded the trailer. Following, they drove and stopped in "Seattle" before returning to New

---

[1] TFO Leo Kelly and TFO Stephen Moravec utilized TFO Noe Marquez (Spanish speaking FHRO Task Force Officer) to conduct a telephone recorded interview with G. LIU. The conversation between G. LIU and TFO Marquez was spoken in the Spanish language.

York. G. LIU denied knowledge of what was loaded and/or offloaded from the trailer, reiterating his instructions to remain in the semi-truck.

54. G. LIU identified a grey-in-color suitcase located in the cab of the semi-truck as belonging to YANG. G. LIU identified a black-in-color "Nike" bag located in the cab of the semi-truck as belonging to Z. LIU. When questioned about the United States currency located in the overhead compartment within the cab of the semi-truck, G. LIU stated Z. LIU utilized the money to pay for fuel.

55. G. LIU denied ownership of any United States currency located within the cab of the semi-truck or trailer, other than a small amount of United States currency located in his wallet. Furthermore, G. LIU stated he is working to repay a debt to YANG and does not receive wages for his work.

56. On approximately October 2, 2024, G. LIU submitted a Seized Asset Claim Form, under the penalty of perjury, to the DEA claiming that he is the rightful owner of the $306,900. G. LIU stated that he possessed the currency for "legitimate and lawful purposes" and that he "obtained it through lawful means…"

57. Based on the foregoing, declarant believes that the $306,900 in United States Currency is property which constitutes money furnished or intended to be furnished by a person in exchange for a controlled substance, or proceeds traceable to such an exchange, or money used to facilitate a violation of 21 U.S.C. Section 801 *et seq.*

Pursuant to 28 U.S.C. Section 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20 day of December, 2024.

GRIFFIN DIECKER
Task Force Officer
Drug Enforcement Administration